**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

CHARTER OAK FIRE INSURANCE
COMPANY,
Plaintiff-Appellee,

v.

CARTERET COUNTY BOARD OF
COMMISSIONERS; CARTERET COUNTY,                No. 95-2858
NORTH CAROLINA,
Defendants-Appellants,

and

OHIO CASUALTY INSURANCE COMPANY,
Defendant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Greenville.
James C. Fox, Chief District Judge.
(CA-94-168-4-F)

Argued: May 8, 1996

Decided: July 12, 1996

Before RUSSELL and ERVIN, Circuit Judges, and NORTON,
United States District Judge for the District of South Carolina,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Donald R. Teeter, POYNER & SPRUILL, L.L.P.,
Raleigh, North Carolina, for Appellant. Howell Arnold Burkhalter,

BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellee. **ON BRIEF:** Eric. P. Stevens, POYNER & SPRUILL, L.L.P., Raleigh, North Carolina, for Appellant. Joseph T. Carruthers, BELL, DAVIS & PITT, P.A., Winston-Salem, North Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This is an insurance coverage appeal that originated as a declaratory judgment action filed by Plaintiff - Appellee, The Charter Oak Fire Insurance Company ("Charter Oak") against Defendants - Appellants, Carteret County, North Carolina and its Board of Commissioners (hereinafter collectively referred to as the "County"). The appeal arises as the result of the district court granting summary judgment in favor of Charter Oak. Relying on North Carolina insurance law, the district court concluded that the County was not entitled to any recovery under a Charter Oak commercial property insurance policy for damages sustained to a county building. Because we agree with the ruling of the district court, we affirm.

I.

On March 13, 1993, a major windstorm accompanied with heavy rain struck the North Carolina coast and resulted in damage to the Carteret County Department of Social Services ("DSS") Building located in Beaufort, North Carolina. The interior of the building sustained significant water damage primarily as the result of water entry through a temporary roof. At the time of the storm, the building was in the midst of a major construction and renovation project which included the removal and replacement of the old roof. The County originally contracted with United Contractors of Kinston, Inc.,

2

("United") to perform the renovations. In July and August 1992, United had begun to place trusses for the new arched roof on the building. The county architect abruptly halted the roof construction in late August when he noticed that the bottom chords of a number of the new roof trusses had been cut, thereby potentially damaging the new roof's structural integrity. Although plywood had already been attached to the trusses along with two layers of fifteen pound roofing felt, the architect instructed United not to place the shingles on the roof until the structural integrity of the roof had been determined. The county architect feared that the additional weight of the shingles could potentially cause the damaged trusses to collapse.

On November 24, 1992, the County terminated United as the contractor for the job in part as a result of the dispute over the damaged trusses. Subsequently, the County made a demand upon United's surety, Ohio Casualty Insurance Company, to complete the renovation project in accordance with the terms of its performance bond. On February 19, 1993, Ohio Casualty agreed to hire a new contractor to complete the project. About a month later, the wind and rain storm struck. On April 7, 1993, the new contractor retained by Ohio Casualty commenced work on the DSS building. In July of 1993, Ohio Casualty began to inquire as to whether some or all of the damage sustained by the building might be covered by a primary insurance policy. In response to that inquiry, the county manager sent the assistant county manager in charge of insurance claims the following memorandum:

> During the period of November 1992-June 1993, the old Social Services building suffered exposure to the elements <u>due to the fact that it was not under roof for most of that time.</u>
>
> Please advise me what organization was our first party insurance carrier during this period of time and if any claim for damages was filed.

J.A. 276 (emphasis added). It was clear at the time of the storm damage that the DSS building was included as insured property under a valid Charter Oak commercial property insurance policy. Although the County had not filed a claim with Charter Oak for the March damage, the assistant county manager stated that she immediately con-

3

tacted Charter Oak's local agent the day she received the above inquiry from the county manager. The local agent responded that coverage would not be available for the water exposure caused by the storm. In mid-August, the assistant county manager received a letter from Ohio Casualty stating that Ohio Casualty intended to seek recovery of $175,000 in storm damages to the DSS building. That letter was ultimately forwarded to Charter Oak and received on August 25, 1993. After its investigation, Charter Oak ultimately denied the claim. Shortly thereafter, Charter Oak instituted this declaratory judgment action.

Subsequent to the filing of the declaratory judgment action, by motion of the County, this action was consolidated with a second action entitled Ohio Casualty Co. v. United Contractors of Kinston, Inc., (No. 4:94-CV-38-F2). Although not a party to this appeal, Ohio Casualty was also a defendant in the Charter Oak case below. Further, the County was a defendant in both the Charter Oak and the Ohio Casualty action. The district court issued an order granting the County's motion to consolidate these cases on April 4, 1995. Although these cases were consolidated for trial, they involved separate legal issues. Charter Oak's motion for summary judgment was granted by order of September 13, 1995. The court held that under North Carolina insurance law, the County's delay in notifying Charter Oak of the storm damage to the DSS building constituted a prejudicial bad faith delay and further that even if the late notice was not prejudicial, the express terms of the policy excluded coverage because the plywood and felt placed on the trusses did not constitute a roof. The County subsequently appealed.

II.

We agree with the district court that the County's notice of a potential loss provided to Charter Oak more than five months after the alleged water damage had been sustained, combined with the fact that the damage had been completely repaired by the new contractor when notice was finally received by Charter Oak, violated the terms of the insurance contract and constituted a bad faith delay thereby excluding coverage. The policy at issue provided that the insured must give Charter Oak "prompt notice of the loss or damage." J.A. 279 (Charter Oak Commercial Property Insurance Policy No. 883G0935, Coverage

4

Form No. CP T1 00 10 91, para. E.3.(a)(2)). The requirement that an insurer "be given notice of a relevant event`as soon as practicable' is an essential part of the insurance contract." <u>Great American Ins. Co. v. C. G. Tate Constr. Co.</u>, 279 S.E.2d 769, 775 (N.C. 1981) (hereinafter "<u>Great American I</u>").

Under North Carolina law, whether an insured has given timely notice is determined by a three step test. The first step is "whether the notice was given as soon as practicable." <u>Id.</u> at 776. Second, the analysis involves deciding "whether the insured has shown that he acted in good faith . . . ." <u>Id.</u> at 776. Finally, "[i]f the good faith test is met the burden shifts to the insurer to show that its ability to investigate and defend was materially prejudiced by the delay." <u>Id.</u> at 776. "[U]nless the insurer's allegations that notice was not timely are patently groundless, the first part of the test is met by the fact that the insurer has introduced the issue to the court." <u>Great American Ins. Co. v. C. G. Tate Constr. Co.</u>, 340 S.E.2d 743, 747 (N.C. 1981) (hereinafter "<u>Great American II</u>").

The first part of this test was met by Charter Oak's raising what was clearly not a patently groundless delay issue with the district court. Even if the County could carry its burden on the second prong of the test, the good faith element, the County's five month delay in reporting the loss to Charter Oak materially prejudiced its ability to investigate the claim, especially in light of the fact that the alleged severe water damage was already completely repaired by the time of notice. Factors relevant to determining prejudice include physical changes to the location, the ability of experts to investigate the loss, and the preparation and preservation of evidence related to the loss. <u>See Great American I</u>, 279 S.E.2d at 776. Although the loss allegedly occurred as the result of a fierce March wind storm, the new contractor hired by Ohio Casualty began working on the building in April. By June, all of the water damaged sheet rock, duct work, insulation and roof sheeting had been removed. By the end of June, the truss repairs were complete, the roof had been re-sheeted and shingled and new interior insulation and sheetrock were being installed. All of this work was accomplished prior to Charter Oak's local agent receiving notice of a potential claim in the latter part of July. The prejudice associated with the length of delay and the extent of construction and repairs is further exacerbated by the fact that even prior to the March

5

storm, there were numerous indications that the building had sustained interior water damage because it had been covered for many months solely by the plywood sheeting and roofing felt. J.A. 271. Further, there is no clear evidence of the condition of the building at the time of the loss or immediately prior to the loss. In actuality, it appears that the County expressed little concern about the damage to the building until Ohio Casualty indicated its intentions to recoup some of the money spent to repair the extensive water damage. As the North Carolina Supreme Court noted in Great American II, "Willful ignorance does not exemplify good faith." Great American II, 340 S.E.2d at 749 n.6. This court agrees with the district court that the County's five month delay under the circumstances of this case constituted a bad faith delay that materially prejudiced the insurer's ability to investigate and defend the claim.

III.

We also agree with the district court that the plywood sheeting and the roofing felt covering the DSS building did not constitute a roof and that the damage was excluded under the policy. The policy clearly provides:

> 1. We will not pay for loss or damage to:
>
> . . .
>
> c. The interior of any building or structure or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not, unless:
>
> (1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters.

J.A. 280 (Charter Oak Commercial Property Insurance Policy No. 883G0935, Coverage Form No. CP T1 08 10 91, para. C.1(c)(1))

6

(emphasis added). Therefore, under the policy, before Charter Oak is liable for interior water damage, there must be damage to the building's roof from a covered loss. In this case, there was no permanent roof on the building because the county architect halted completion of the roof construction long before the March storm.

Further, we do not agree with the Appellant that there exists any ambiguity in the word "roof." As noted by the California Court of Appeals in Diep v. California Fair Plan Ass'n , 19 Cal. Rptr.2d 591 (Ct. App. 1993):

> While "roof" has many different meanings, (e.g., roof of the mouth) dictionary definitions are consistent with respect to that which people usually expect to find on top of a building. The Random House College Dictionary (1982) defines roof as "the external upper covering of a house or other building." (At p. 1145). Webster's Third New International Dictionary (1976) defines it as "the outside cover of a building or structure including the roofing and all the materials and construction necessary to maintain the cover upon its walls or other support[.]"(At p. 1971) The American Heritage Dictionary, Second College Edition (1982) defines it as the "exterior surface and its supporting structures on the top of the building." (At p. 1070)
>
> We could go on, but a roof is commonly considered to be a permanent part of the structure it covers. Roof is not an ambiguous or vague word.

Id. at 593 (emphasis added); see Camden Fire Ins. Ass'n v. New Buena Vista Hotel Co., 24 So. 2d 848, 850 (Miss. 1946) (en banc) ("To be, or become, a roof, its construction or reconstruction must have reached the point where a reasonably prudent householder would consider it, if left in that condition for a month or months, or longer, as adequate against all risks of wind and rain which could be reasonably anticipated as likely to happen . . . ."), aff'd on suggestion of error review, 26 So. 2d 174 (Miss. 1946) (en banc); cf. New Hampshire Ins. Co. v. Carter, 359 So. 2d 52, 54 (Fl. Dist. Ct. App. 1978) ("It is not reasonable to presume that the parties intended that the coverage provided against loss from certain limited risks would be

7

expanded to provide coverage against any and all risks merely by the act of the insured making repairs."). Therefore, we agree with the district court that the plywood sheeting and felt paper covering the DSS building at the time of loss was not a roof as intended by the parties under the insurance contract. Therefore, water damage sustained to the interior of the building was excluded under the Charter Oak policy.

IV.

For the foregoing reasons, we conclude that the county's delay in notifying Charter Oak of the alleged loss constituted a bad faith and prejudicial delay and further that any damage the DSS building sustained as a result of the March 1993 storm was excluded under the policy because the building was not covered by a permanent roof at the time of loss. Therefore, we affirm the judgment of the district court.

AFFIRMED

8